# COMMISSIONERS OF PILOTAGE OF MOBILE BAY
## vs.
## STEAMBOATS CUBA, SWAN, AND J. H. BELL.

[LIBELS AGAINST STEAMBOATS FOR VIOLATION OF REGISTRATION LAW.]

1. *Lighter and tow-boat within statute.*—Under the act of February 15, 1854, (Pamphlet Acts 1853–4, p. 50,) "to provide for the registration of the names of steamboat owners," which imposes a penalty upon the owners of any steamboat, navigating the waters of this State, for a failure to file in the proper office, "*before such boat leave the port of Mobile*," a written statement of the names and residences of her owners; *held*, that a steamboat, used exclusively as a lighter and tow-boat, which plied between the wharves of the city and the lower part of the bay outside the bar, carrying cargoes to and from large vessels which could not pass the bar, was within the statute, although she never went outside the limits of the port of Mobile.

2. *Limitation of suit for penalty against boat.*—The provision of the second section of this act, which gives a remedy against the steamboat by admiralty process, "in the same manner as is provided by the laws of this State for the recovery for work and materials furnished steamboats," refers only to the form and mode of conducting the proceeding, but does not limit the suit to thirty days after the accrual of the cause of action. The limitation of the suit is one year, as prescribed by section 2481 of the Code.

3. *Constitutional power of Congress to regulate commerce.*—The constitutional power vested in Congress to regulate commerce between the several States, necessarily includes the power to regulate navigation, as one of the means by which commerce is carried on, and, where the navigation extends into the interior, is not arrested by the intervention of State boundaries, but the grant of this power to Congress does not operate as an absolute prohibition on the States to legislate on the subject.

4. *Registration act not regulation of commerce.*—The act of February 15, 1854, "to provide for the registration of the names of steamboat owners," which requires a written statement of the names and residences of the owners of steamboats navigating the waters of this State to be filed in the probate court of Mobile, and imposes a penalty of $500 for its violation, is not a

13

Commissioners of Pilotage, &c., v. Steamboats Cuba, Swan, and J. H. Bell.

regulation of commerce, within the constitutional grant of that power to Congress.

5. *Nor in conflict with license laws of United States.*—The laws of the United States, regulating the coasting trade, do not confer rights, in the proper sense of that term, but rather impose restrictions on the trade ; and the additional requisition of this State statute, as is does not obstruct or dispense with any of the requisions of the acts of Congress, cannot be said to be in conflict with them.

6. *Nor violative of ordinance of* 1819, *as imposing tax or duty.*—The requisition which this statute makes upon the owners of steamboats, is not a tax, duty, impost, or toll, within the ordinance of 1819, by which Alabama accepted the conditions of the act of Congress admitting her into the Union, and declared "that all navigable waters within this State shall forever remain public highways, free to the citizens of this State and of the United States, without any tax, duty, impost, or toll therefor, imposed by this State."

APPEAL from the City Court of Mobile.
Tried before the Hon. ALEX. McKINSTRY.

The proceedings in these cases were instituted in the name of the commissioners of pilotage of the bay and harbor of Mobile, on the affidavit of Wm. S. Paine, to recover the penalty of $500 for an alleged violation of the act, approved February 15, 1854, entitled "An act to provide for the registration of the names of steamboat owners." In the case of the *Swan*, the libel alleged a single violation of the act—to-wit, " that the owners of said steamboat, in violation of said act, did permit the said steamboat to be navigated on the Mobile or Alabama river, a river of this State indifferently known by both of said names, before the first day of March, 1855, without first having filed the certificate or statement as provided for and required by said act; and that said steamboat left the port of Mobile, after the first day of July, 1854, for the purpose of said navigation, and within thirty days last past." In the case of the *Cuba*, the libel alleged three separate violations of the act, as occurring on the 26th and 27th of February, and on the 2d of March, 1855; and in the case of the *J. H. Bell*, six separate violations of the act were alleged—to-wit, on the 16th, 17th, 18th, 19th, 20th, and 21st days of February, 1855. The libel against the *J. H. Bell* was filed on the 1st day of March, and the others on the 5th day of March; and in each case a writ of seizure was

issued, under which the sheriff took possession of the boats.

The owners of each boat intervened, and filed their exceptions and answers to the libels, in substance as follows:

*J. H. Bell.*—Exception: " That the libel is insufficient in law in this : that the statute of the State of Alabama, for the violation of which said libel is brought against said steamboat, is contrary to the constitution of the United States, and void." Answer : *First.*—That said steamboat is not guilty of a violation of the said law of the State. *Second.*—Admits that said steamboat did pass by the port of Mobile, on the 16th February, 1855, on her trip from the city of New Orleans, in the State of Louisiana, to Montgomery, in Alabama, without her owners having filed the statement required by said statute; but alleges that, on the 17th and 18th days of said month, she was on the Alabama river, running for the city of Montgomery in said State, and that she was not in, and did not leave, the port of Mobile on said last-mentioned days. Denies that said steamboat run or navigated the Mobile or Alabama river, within the meaning of the act aforesaid; and alleges that said boat, on the 16th February aforesaid, ran from the city of New Orleans, in the State of Louisiana, a place out of the State of Alabama, to the city of Montgomery, in said State of Alabama, and that said boat run and navigated upon the high seas and lakes between the States of Louisiana and Alabama, as well as upon the waters or rivers of Alabama. *Third.*—That said steamboat, at the time she was libeled by said commissioners of pilotage, was engaged in the coasting trade between the States of Alabama and Louisiana, was regularly enrolled as a coasting vessel at the custom-house of the United States, pursuant to the act of Congress, and was duly licensed to run in the coasting trade, by the collector of the port of Galveston, for the term of one year; which said license was in full force at the time said libel was issued.

*Cuba.*—Exception same as above. Answer: *First.*—That the owners of said boat are not guilty of violating said statute mentioned in said libel. *Second.*—Admits that said boat did leave the port of Mobile on the several days specified in said libel, without her owners having filed the statement required by said statute; denies that said boat did, on

said days or at any other time, run or navigate the Alabama or Mobile river, within the meaning of said act; and alleges that said boat, on said specified days and at all other times, did run or navigate the high seas and lakes between the port of New Orleans, in the State of Louisiana, and the port of Mobile, in the State of Alabama. *Third.*—Alleges that said boat, before and at the time she was libeled by said commissioners, was engaged and employed in the service of the United States, in carrying the United States mail from said city of Mobile to said city of New Orleans. *Fourth.*—Alleges that said boat, before and at the time she was libeled by said commissioners, was engaged in the coasting trade between the States of Alabama and Louisiana, was regularly enrolled in the custom-house of the port of New Orleans, and was duly licensed to run in the coasting trade of the United States, by the collector of customs for said port, for the term of one year; which said license was in full force and unexpired at the time said libel was filed.

*Swan.*—Claim, exceptions, and answer as follows:

" 1. That they (the stipulators) are the true and *bona fide* owners of said steamboat, her tackle, apparel, and furniture; and that no other person is the owner thereof.

" 2. That they do not know, and cannot answer, whether the said libellants, and each and every one of them, are or are not the commissioners of pilotage of the bay and harbor of Mobile; and they insist that said libellants be required to make due proof that they are such commissioners.

" 3. That said libel is not sufficient in law to support the claim of the libellants, in this : that said libel does not allege or show who were the owners of said steamboat; that it does not allege or show the facts necessary to show that the owners of said boat have incurred the forfeiture, or subjected themselves to the penalty, prescribed by the act mentioned in said libel; that said act is contrary to the constitution of the State of Alabama, and to the constitution and laws of the United States of America; that the penalty and forfeiture mentioned in said act is a personal penalty or forfeiture, which may be incurred by the owner or owners of any steamboat who may fail to perform the duties prescribed by said act, and not a forfeiture of said steamboat itself, and cannot

be recovered or enforced by a proceeding in admiralty against such steamboat alone for its condemnation; that said libel is equivocal and uncertain, in stating that said steamboat was run on one or the other of two different rivers in the State of Alabama, to-wit, the Alabama river and the Mobile river, without stating in which of them it was so run, and is uncertain and insufficient in other respects; that said libel does not show any case of which this court, as a court of admiralty, can take cognizance.

" 4. That said boat has never left the port of Mobile since the first day of July, A. D. 1854.

" 5. That said boat did not leave the port of Mobile within thirty days next preceding the filing of said libel.

" 6. That said steamboat is an American vessel, of more than twenty tons burthen, was built in the United States of America, and is and always has been wholly owned and commanded by citizens of the United States of America; that said steamboat, before the passage of the act mentioned in said libel, was duly enrolled and licensed in and at the United States custom-house at Mobile, in conformity with an act of Congress, entitled ' An act for enrolling and licensing ships and vessels to be employed in the coasting trade and fisheries, and for regulating the same,' and has always from that time continued to be, and still is, so enrolled and licensed; that said steamboat, since the first day of July, 1854, has never been used or navigated in or upon any other rivers or waters of the State of Alabama than tide waters navigable from the sea, and constituting part of the coast of the United States of America; and so they say that said steamboat is not, and they as owners of said steamboat are not, liable to any penalty or forfeiture prescribed by said act.

" 7. That the port of Mobile, before and at the time of the passage of said act mentioned in said libel, was and is a port of entry of the United States of America, and was and is resorted to and frequented by ships and vessels, of different size and tonnage, engaged in the trade and commerce of the United States with foreign nations and among the several States, for the purposes of such trade and commerce; that ships and vessels of small size and tonnage, so engaged in such trade and commerce, were and are accustomed to come

up to the wharves of the city of Mobile, within the port of Mobile, and where the tide ebbs and flows, for the purpose of discharging or receiving their cargoes in carrying on such trade or commerce; that other ships and vessels, of larger size and tonnage, so engaged in such trade and commerce, and so resorting to and frequenting said port for the purposes aforesaid, cannot come up to the wharves of said city, on account of the shallowness of the water in some parts of the bay of Mobile belonging to said city, and have long been and are now necessarily compelled and accustomed to anchor in the lower parts of said bay, and to discharge and receive their cargoes by the means and use of lighters, employed to carry the cargoes of such ships and vessels from such ships and vessels to the wharves of the city, and from the wharves of said city to such ships and vessels, and it has long been and is necessary and customary that ships and vessels resorting to and frequenting said port should be towed in and out of said port and bay, in entering and leaving said port, by steam tow-boats; that said steamboat *Swan*, so being an American vessel as aforesaid, duly enrolled and licensed, before the passage of said act of the legislature of Alabama, was, and ever since that time has been, and is now, used and employed, wholly and exclusively, as a lighter and steam tow-boat, within the port of Mobile and upon tide waters, and has never, since the first day of July, 1854, been used, run or navigated in any rivers or waters of the State of Alabama above the said port of Mobile."

The case of the *Swan* was submitted to the court, on an agreement that the facts set forth in the libel and answer are true, except in so far as they are modified and controlled by the following statement : "It is agreed by the parties in this case, that the allegations in the claimants' answer are admitted to be true, except the denial that said steamboat has left the port of Mobile within thirty days next preceding the filing of this libel; and that question is to be submitted to the court, as a mixed question of law and fact, reserving to either party the liberty of appealing from the decision of the court, either as to the law, or facts, or both. It is further admitted, on that question, that the said steamboat has been solely employed as a lighter and steam tow-boat, as alleged

in the answer; that, in prosecuting said business, said boat has come up to the wharves of the city, from the lower part of the bay, and returned from the wharves to such ships; that, in so doing, said boat has sometimes come up or gone down the channel commonly known as Spanish river, which is a channel by which vessels are accustomed to come up to the wharves of the city; that it is considered and spoken of generally, by the port-wardens and pilots, as part of the port of Mobile, and as coming within their jurisdiction and authority as such, and that it and the whole bay of Mobile is generally considered the port of Mobile; that said vessels, in said navigation, also navigate the Mobile river in front of the city of Mobile; that the Mobile river in front of the city, and the Spanish river, are within the corporate limits, while the lower bay of Mobile is beyond the corporate limits of said city; that said boat, in said navigation, sometimes tows vessels beyond the outer bar of the bay, and into the gulf to the extent of two or three miles, but has not done so within thirty days next preceding the filing of this libel, but has since July, 1854. It is admitted, also, that there are other vessels than steamboats, to-wit, vessels propelled by sails, of large size and tonnage, which are engaged in the trade and business of lighters as aforesaid, in the same manner with steamboats." The facts of the two other cases, except so far as they appear in the libel and answers, are not stated in the record.

The court dismissed each of the libels; holding, in the cases of the *Cuba* and *J. H. Bell*, that vessels engaged in the coasting trade between New Orleans and Mobile, regularly enrolled and licensed under the acts of Congress, were not within the provisions of the statute. The decree in the case of the *Swan* does not state the reason on which it was founded. These decrees are now assigned for error.

JOHN T. TAYLOR, for the appellants, contended,—

1. That the statute of Alabama, under which these proceedings were instituted, was not a regulation of commerce, but of police, and was therefore passed in the exercise of a power rightfully belonging to the State.—City of New York v. Miln, 11 Peters, 102.

2. That, even if the statute fell within the power granted

to Congress, still Congress has not the exclusive right to legislate on the matter within the State; and, as the statute does not come in collision with any legislation by Congress, it is not unconstitutional.—Cooley v. Board of Wardens of Philadelphia, 11 Howard, 299.

WM. G. JONES, P. HAMILTON, E. S. DARGAN, and B. LABUZAN, *contra*, made the following points :

1. The statute on which these libels are founded, is highly penal, and should be strictly construed. This principle is applicable to statutes passed in restraint of trade and commerce, and imposing penalties or forfeitures.—Dwarris on Statutes, 742. If a statute admits of two constructions, by one of which it would be constitutional and valid, while by the other it would be unconstitutional and void, the former construction must be given to it.

2. The State has power to pass laws regulating its purely internal commerce, but it has no power to pass laws regulating or interfering with foreign commerce, or commerce between the different States ; the latter power being vested exclusively in Congress.—Authorities cited below. This statute, therefore, should be so construed as to limit its application to steamboats engaged exclusively in the purely internal trade, and navigating the interior rivers of the State, and not to extend it to steamboats engaged exclusively in the foreign and coasting trade.

3. But, if the act is to be construed as extending to enrolled and licensed American vessels engaged exclusively in the foreign and coasting trade, then it is insisted that the act, to that extent, is contrary to the constitution of the United States, and consequently void. The varying and conflicting provisions of the laws of the several States under the old " articles of confederation," in relation to commerce and shipping, constituted one of the greatest evils of that system; and to remedy this evil, and to secure uniformity in the laws and regulations on that subject, was one of the principal objects in view in forming the constitution. The constitution (Art. I, § 8) accordingly expressly confers upon Congress " the power to regulate commerce with foreign nations, and among the several States." The power to regulate com-

merce includes the power to regulate navigation, which is one of the means by which commerce is carried on; and, if navigation, then also it includes vessels, which are the instruments of navigation.—Gibbons v. Ogden, 9 Wheat. 190–93, 229–30; Brig Wilson, 1 Brock. 431. This power does not stop at the external boundaries of a State, but continues from the beginning to the end of the navigation.—9 Wheat. 144; Brown v. State of Maryland, 12 *ib.* 446; 1 Kent's Com. 432; 32 Maine, 362–4; 3 Cowen, 713.

4. The mere existence of this power in Congress, if it had never been exercised, excludes the right of any State to pass any laws on the subject. Commerce, in its very nature, is a free intercourse; and legislation is only needed to restrain, to regulate it. The legislation of Congress speaks as strongly by its silence, by what it omits, as by what it prescribes.—16 Peters, 617–18; 5 Wheat. 1–21; 13 Howard, 566; 11 Peters, 145; 14 *ib.* 575; 12 Wheat. 419, 445; 7 Howard, 434. But, whether this be so or not is of no consequence, Congress having exercised its power from the commencement of the government up to the present time, and thus necessarily excluded all other legislation on the subject. 1 U. S. Statutes at large, 55, 287, 305; 9 *ib.* 440; 2 Peters, 245; 12 Howard, 299; Sheffield v. Parsons, 3 Stew. & P. 302; Fontaine & Dent v. Beers & Smith, 19 Ala. 722. There is no question that Congress has undertaken, by legislation, to regulate commerce, as carried on by navigation, with foreign nations, and the coasting trade. Those laws declare what shall be done by the owners of vessels, to enable them to engage in one or the other kind of commerce; and the officers of the customs are directed to issue licenses, which necessarily import authority or permission to do the thing licensed, to such vessels as comply with the regulations. The act of 1854 interferes with the navigation of boats trading on the waters of Alabama. It prescribes a further condition, over and beyond those imposed by the laws of the United States. It operates directly on the vessel, prohibiting it from leaving the port of Mobile until its owner has complied with the new condition. It subjects the vessel itself to seizure and sale to pay the penalty,—the same means that Congress has adopted to enforce obedience to its laws.

5. The act cannot be supported as a police law. It is, by its title and in its provisions, a registration act; and none of its provisions are of the character of police regulations, which embrace only laws for the prevention or punishment of crime, or for the preservation of the health, morals, and peace of the community. Its operation is strikingly different from that of any police law which has been sustained by the supreme court. They operated on the person; this on the boat. They operated at the termination of the voyage; this operates to forbid a voyage from Mobile, or to arrest the vessel in its voyage.—The License cases, 5 Howard, 589–92; The Passenger cases, 7 *ib.* 408, 425, 457; Moore v. Illinois, 14 *ib.* 18.

6. The statute is also violative of the ninth and tenth sections of the first article of the constitution, which declare that "No State shall, without the consent of Congress, lay any duty of tonnage," "nor shall vessels bound to or from one State be obliged to enter, clear, or pay duties in another." The term *duties*, as defined by Bouvier (Law Dictionary, vol. 1, p. 349), embraces all impositions or charges levied on persons or things; and the courts have considered the terms very nearly synonymous.—7 Howard, 408, 414; 3 Stew. & P. 304. The amount of the tax is but small, but that does not affect the principle.—12 Wheat. 439; 4 Denio, 475; 3 Stew. & P. 302.

7. The statute is also violative of the ordinance of Alabama, accepting the act of Congress which admitted her into the Union, which declares that all her navigable waters "shall forever remain public highways, free to the citizens of this State and of the United States, without any tax, duty, impost, or toll therefor, imposed by this State."

8. The act is also contrary to the constitution of Alabama. It violates the first section of the first article, because it applies only to the owners of steamboats leaving the port of Mobile, and does not apply to boats navigating the Tennessee or the Chattahoochie river, or even to boats running on the Alabama or Tombeckbee between points above the port of Mobile. It violates the ninth section of the same article, because it authorizes the seizure of a boat, of the value (it may be) of $50,000, without any notice to the owner, and though he may be living in Mobile.

JANUARY TERM, 1856.          195

Commissioners of Pilotage, &c., v. Steamboats Cuba, Swan, and J. H. Bell.

9. But, even if all the foregoing propositions should be held erroneous, still the libel against the *Swan* cannot be sustained, because it was not shown that she had left the port of Mobile as alleged.  The court below properly held, that no penalty was incurred unless the boat had left the port of Mobile without making the registration prescribed.  So far as this was a question of fact, the decision, even if erroneous, is not revisable in this court; and, so far as it is a question of law, the decision is undoubtedly correct.  A vessel might lie in the port, or move from point to point within the port, for ten years, and yet incur no penalty under the act *until it left the port* without making the registration.  It was indispensably necessary, too, that it should be alleged and proved that the boat had left the port within thirty days next preceding the filing of the libel.  The act gives two remedies for the recovery of the penalty : one by suit against the owner, and the other by attachment. by admiralty process against the boat, "*in the same manner*" as provided by law for the recovery for work and materials furnished steamboats; that is, by libel filed within thirty days after the right accrued.—Code, § 2706.

GOLDTHWAITE, C. J.—By the statute of 15th February, 1854, the owners of all steamboats, navigating the waters of this State, are required to file in the office of the judge of probate of Mobile county a statement in writing, and on oath, of the name of the boat, its owners, and their place of residence; and upon any change of ownership being made, the transferree is required to file a similar statement, setting forth such change, his place of residence, and the interest transferred.  The statement is required to be filed before the boat leaves the port of Mobile, and may be made by agent or attorney.

The second section gives a penalty against the owners of any steamboat, who shall permit the same to be run or navigated upon any of the rivers of the State; which may be recovered either by suit against them, or by "attachment against the boat by admiralty process, in the same manner as is provided by the law of this State for the recovery for work and materials furnished steamboats."

The object of the statute is apparent upon its face. It was designed to give more effectual protection to the persons and the property of citizens, by advancing their remedies for torts or contracts done or made by the agents of steamboats, while navigating the waters of this State. The statute itself makes no exception. A compliance with its requisitions is demanded of the owners of all boats leaving the port of Mobile, and navigating our rivers; and, in view of the objects of the act alone, no good reason is perceived for distinguishing in favor of the owners of boats engaged in navigation which extends beyonds the limits of the State.

In the case of the *Swan*, it has been urged that, to subject the owners to the penalty, it is necessary that the boat should go outside of the limits of the port of Mobile, which includes a portion of the river above and below the city, as well as the upper and lower bay. We cannot, however, give the statute this construction. A port means a "commercial point to which vessels resort", as well as a "collection district", a "harbor", or "shelter." Where the navigation was continuous, and extended through and beyond the limits of the port, we incline to the opinion that, if a vessel in her voyage anchored within the limits of the port, the right to the penalty would not accrue, although she had navigated a portion of the river; but where the navigation was not of that character, but commenced at Mobile, or at any other point in the bay or harbor, it would be a leaving of that port, within the meaning of the act, when she started from her berth at the wharf, or broke anchor, and proceeded on her voyage.

Neither can we agree that the remedy against the boat is barred by the failure to proceed within thirty days after the penalty accrues. The act, in assimilating the remedy to the law for the enforcement of mechanic's liens, refers simply to the form and mode of conducting the proceeding. The limitation is prescribed by the Code, (§ 2481,) which bars all causes of action, for which a special remedy is given by attachment against steamboats, in one year.

The three boats, then, all occupy the same position in law. They have all left the port of Mobile, and all have navigated the rivers of the State; and they are each liable to the penalty

which the law declares against them, unless the constitutional objections which have been urged against the validity of the statute can be sustained.

By the constitution of the United States it is provided, that Congress shall have power to regulate commerce "among the several States ;" and it is conceded that this power necessarily includes the right to regulate navigation, as one of the means by which commerce is carried on, and that power is co-terminous with the act to which it applies—that in case of commercial intercourse between two States, where the navigation continues into the interior, the power of Congress in the regulation of the subject is not arrested by the intervention of State boundaries, but in such cases may be exercised up to the point where the act of commerce or navigation terminates.

We do not, however, admit that the mere grant of this power operates as an absolute prohibition on the States to legislate on the same subject; and we are not aware that the affirmative of this proposition has received the sanction of any court. The judges of the supreme court of the United States have expressed different views on this question; but the opinion of the majority of the members of that court in the license cases, (5 How. 504,) and the decision of the court in the more recent case of Cooley v. The Board of Wardens of Philadelphia, (12 How. 299,) are directly opposed to such a conclusion.

But, if it was conceded that the power to regulate commerce between the States was vested exclusively in Congress, —is the act in question are gulation of commerce ? It interposes no obstruction to navigation. It simply demands of steamboat owners, for the purpose of facilitating legal remedies, that, before their boats leave the commercial port of the State, to navigate its waters, they should register the name of the vessel, and of themselves, with the place of their residence. The penalty for the omission to perform these requisitions acts upon the vehicles of commerce, it is true; and so does every State law which give an attachment, or writ of seizure, or execution against a vessel for a wrong done or contract violated. A law which authorizes a creditor to take the body of a seaman against whom he has a

judgment, when found within the jurisdiction of the State, may, in particular cases, embarrass and retard navigation,— may act upon the means by which commerce is carried on; and yet such laws could not be regarded as regulations of commerce. The failure of a grantee to have his deed recorded, may result in defeating his title and turning him out of the possession of his land; but the law which required the registration of the deed, if it enforced the requisition by the forfeiture of the land, could in no sense be deemed a regulation of agriculture. We think the error is in confounding the remedy which is given for the violation of the law, with the duty which it imposes. If the act, therefore, is not to be regarded as a regulation of commerce, the argument that it is in derogation of the powers of Congress on that subject fails.

But it is urged, that the State law is in conflict with the laws of the United States upon the subject of navigation; and that, in such cases, the law of Congress is declared by the constitution to be the supreme law of the land. But where is the conflict? Both laws can be executed, without in the slightest degree interfering with each other; and it certainly can be no objection to a State law, that it adopts the same or similar means to carry out its powers, which Congress has employed in the exercise of a power belonging to the United States.—Marshall, C. J., in Gibbons v. Ogden, 9 Wheat. 204.

But it is said, that the compliance with the laws of the United States, and taking out a coasting license, conferred upon the vessels the right to pursue that navigation for the term specified in the license; and that the State, by adding another requisition to those imposed by Congress, has impaired this right. If the argument be a sound one, and the effect of the license issued under the authority of the law was to confer upon the vessel the absolute and unqualified right to the extent which is claimed by the counsel for the appellees, it would seem to follow that any State legislation, which affected the right, would be an unwarrantable exercise of power; and yet it is not denied that the license does not prevent a quarantine law, passed by a State, from arresting the vessel, while engaged in a navigation of which Congress has the control, and, if need be, consigning both cargo and

JANUARY TERM, 1856. 199

Commissioners of Pilotage, &c., v. Steamboats Cuba, Swan, and J. H. Bell.

vessel to destruction. So it has been held, that a State, by a police law, may add a requisition to those imposed by Congress in navigation between the States, when the act operates within the limits of the State.—Fitch v. Livingston, 4 Sand. Sup. Ct. Rep. 492. If the statute of this State is to be referred to the police powers, which, in a broad sense, embrace all legislation for the internal regulation and domestic order of the State, (4 Black. Com. 162,) it falls directly within the influence which sustains the laws to which we have just referred. So, also, if these laws are valid, simply because they are regarded as a lawful exercise of a power which the States have never given up, as the same principle would apply equally to the other reserved powers, it would be no objection to laws passed to assert them, that they imposed additional requisitions to those which the laws of the United States imposed upon the same subject. On the other hand, if the validity of State police laws, when affecting commerce, are sustained on the ground that the State powers, in these respects, form an implied exception to the grant to regulate commerce, then the grant itself must be construed as if the exception was expressed, and the State law would be paramount.

We do not, however, consider it necessary to determine these delicate and interesting questions; and have merely referred to them for the purpose of showing that, if the statute in question is to be referred to the police powers of the State, it is valid, in any aspect in which it can be presented.

If it is not properly to be referred to these powers, then the answer to the objection we have stated, is, that the regulations of Congress, in relation to the coasting trade, so far as granting licenses is concerned, were not intended to confer rights, in the proper sense of that term, but were intended to operate as restrictions, preventing vessels from pursuing that navigation at all, unless they complied with the requisitions deemed by Congress essential to the national interests. If the State law dispensed with, or obstructed, the execution of these regulations, a different question would be presented. But, when the two laws are not in collision, and the State law is passed in pursuance of a power which it possesses, we cannot hold it invalid, merely because it adds to a requisition made by Congress in the exercise of a different power.

In relation to the suggestion, that the act is in violation of the ordinance of Congress, accepted by Alabama, which declares "that all navigable waters within the State shall forever remain public highways, free to the citizens of this State and of the United States, without any tax, duty, impost, or toll therefor, imposed by this State," we deem it unnecessary to say more than that we do not regard the requisitions which the act makes upon the owners of boats as either a tax, duty, impost, or toll, for using the rivers of this State as a highway, within the spirit and meaning of this ordinance.

The decree below is reversed, and the cause remanded.